# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DOLLAR RENT A CAR SYSTEMS, INC., an Oklahoma corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 01-cv-698-JHP-FHM |
| P.R.P. ENTERPRISES, INC., a Florida corporation, PEDRO R.P. DEMORAES, an individual resident of Florida, RUBENS P. TADDEI, an individual resident of Florida, P.R.T. ENTERPRISES, INC., a Virginia corporation, and ROSANA TADDEI, an individual resident of Florida, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

A.    Parties

1.    Dollar is an Oklahoma corporation having its principal place of business in

Tulsa, Oklahoma.  (Agreed Pretrial Or., 4, ¶ A(1) (Sept. 13, 2004).)

2.    Defendants are P.R.P. Enterprises, Inc. ("P.R.P."), a Florida corporation

formerly having its principal place of business in Pensacola, Florida; P.R.T. Enterprises, Inc.

("P.R.T."), a Virginia corporation formerly having its principal place of business in Norfolk,

Virginia (collectively, the "Corporate Defendants"); Pedro R.P. De Moraes ("Moraes"), an

individual resident of Pensacola, Florida; Rubens P. Taddei ("Mr. Taddei"), an individual

resident of Tampa, Florida; and Rosana Taddei ("Mrs. Taddei"), an individual resident of

Tampa, Florida (collectively, the "Individual Defendants") (Corporate Defendants and Individual Defendants, collectively, the "Defendants".)  (Agreed Pretrial Or., 4, ¶¶ A (2)-(6).)

3.     Moraes owns P.R.P. and has a fifty-one percent (51%) ownership interest in P.R.T. (Tr. Transcr., vol. 1, 56 (Nargi Direct)(Sept. 13, 2004), vol. 3, 375-376 (Taddei Direct)(Sept. 15, 2004); Pl.'s Ex. 8, Attach. E.)  Mr. Taddei owns the remaining forty-nine percent (49%) of P.R.T.  (Tr. Transcr., vol. 3 at 375-376 (Taddei Direct).)

B.     Agreements

1.     The Corporate Defendants each entered into two License Agreements with Dollar during the 1990s (all four such agreements hereinafter collectively referred to as the "License Agreements".) (Pl.'s Exs. 8, 14, 29 & 35.)  Pursuant to these License Agreements, as of September 2001, P.R.P. operated Dollar franchises in Pensacola, Florida; Mobile, Alabama; and Birmingham, Alabama; and P.R.T. operated Dollar franchises in Norfolk, Virginia and Richmond, Virginia.  (Id.; Tr. Transcr., vol. 1, 55, 58, 61-63 (Nargi Direct).)

2.     In connection with the execution of each of these License Agreements, Dollar and the Corporate Defendants also entered into a Master Lease Agreement for each franchise location, whereby Dollar leased or subleased vehicles to the Corporate Defendants (all four such agreements hereinafter collectively referred to as the "Master Lease Agreements".)  (Pl.'s Exs. 9, 15, 19, 30 & 36.)

3.     Performance of the License Agreements and Master Lease Agreements  by the Corporate Defendants was further secured by guarantees executed by the Individual Defendants, pursuant to which Moraes personally guaranteed all obligations of P.R.P. and P.R.T. to Dollar, Mr. Taddei personally guaranteed all obligations of P.R.T. to Dollar, and Mrs. Taddei, Mr. Taddei's wife, personally guaranteed the obligations of P.R.T. to Dollar with

respect to the Richmond License and Master Lease Agreements (all such guarantee agreements hereinafter collectively referred to as the "Guarantee Agreements")[1].  (Pl.'s Exs. 10, 16-17, 20, 31-33 & 37.)

4.     On October 3, 1991, Dollar and P.R.P. entered into a License Agreement permitting P.R.P. to operate a vehicle rental business in the City of Pensacola in the State of Florida, using the Dollar trade name, service marks, and methods of operation in exchange for payment of certain fees and charges, including systems fees, and with interest and late charges incurred for overdue amounts (the "Pensacola License Agreement".)  (Agreed Pretrial Or., 4, ¶ B (1); Pl.'s Ex. 8.)

5.     Mr. Moraes personally guaranteed the performance by P.R.P. of all of its duties and obligations to Dollar under the Pensacola License Agreement.  (Agreed Pretrial Or., 5, ¶ 3; Pl.'s Ex. 10.)

6.     On October 8, 1992, Dollar and P.R.T. entered into a License Agreement permitting P.R.T. to operate a vehicle rental business in the Cities of Norfolk, Virginia Beach, Newport News and Hampton in the State of Virginia, using the Dollar trade name, service marks, and methods of operation, in exchange for payment of certain fees and charges, including systems fees, and with interest and late charges incurred for overdue amounts (the "Norfolk License Agreement".) (Agreed Pretrial Or., 5, ¶ 4; Pl.'s Ex. 14.)

7.     Mr. Moraes and Mr. Taddei personally guaranteed, jointly and severally,  the performance by P.R.T. of all of its duties and obligations to Dollar under the Norfolk License Agreement.  (Agreed Pretrial Or., 5, ¶¶ 5-6; Pl.'s Exs. 16 & 17.)

8.     On October 9, 1992, in connection with the Norfolk License Agreement, Dollar and P.R.T. entered into a Master Lease Agreement allowing P.R.T. to lease vehicles from

---

[1]   The License Agreements, Master Lease Agreements and Guarantee Agreements being sometimes referred to herein collectively as the "Agreements".

Dollar at certain specified locations upon payment to Dollar of a monthly lease rate for each vehicle included under the lease (the "Norfolk Master Lease Agreement".)  (Agreed Pretrial Or., 5, ¶ 7; Pl.'s Ex. 15.)

9.     On October 9, 1992, Mr. Moraes and Mr. Taddei personally guaranteed, jointly and severally, the obligations of P.R.T. to Dollar under the Norfolk Master Lease Agreement. (Agreed Pretrial Or., 5, ¶¶ 8-9; Pl.'s Exs. 16 & 17.)

10.     On October 9, 1992, Dollar and P.R.P. amended the Pensacola License Agreement, to insert cross-default provisions with reference to P.R.T and its contractual obligations to Dollar.  (Agreed Pretrial Or., 5, ¶ 10.)

11.     On September 20, 1993, in connection with the Pensacola License Agreement, Dollar and P.R.P. entered into a Master Lease Agreement allowing P.R.P. to lease vehicles from Dollar at certain specified locations upon payment to Dollar of a monthly lease rate for each vehicle included under the lease (the "Pensacola Master Lease Agreement".)  (Agreed Pretrial Or., 6, ¶ 11; Pl.'s Ex. 19.)

12.     On September 20, 1993, Mr. Moraes personally guaranteed the obligations of P.R.P. to Dollar under the Pensacola Master Lease Agreement.  (Agreed Pretrial Or., 6, ¶ 12; Pl.'s Ex. 20.)

13.     On April 9, 1999, Dollar and P.R.T. entered into a License Agreement, permitting P.R.T. to operate a vehicle rental business in Henrico and Chesterfield Counties and the City of Richmond in the State of Virginia, using the Dollar trade name, service marks, and methods of operation, in exchange for payment of certain fees and charges, including systems fees, and with interest and late charges incurred for overdue amounts (the "Richmond License Agreement".)  (Agreed Pretrial Or., 6, ¶ 13; Pl.'s Ex. 29.)

14.     Mr. Moraes, Mr. Taddei and Mrs. Taddei personally guaranteed, jointly and severally, the performance by  P.R.T. of all of its duties and obligations to Dollar under the Richmond License Agreement.   (Agreed Pretrial Or., 6, ¶¶ 14-16; Pl.'s Exs. 31-33.)

15.     On April 9, 1999, in connection with the Richmond License Agreement, Dollar and P.R.T. entered into a Master Lease Agreement allowing P.R.T. to lease vehicles from Dollar at certain specified locations upon payment to Dollar of a monthly lease rate for each vehicle included under the lease (the "Richmond Master Lease Agreement".)  (Agreed Pretrial Or., 6, ¶ 17; Pl.'s Ex. 30.)

16.     On April 9, 1999, Mr. Moraes, Mr. Taddei and Mrs. Taddei personally guaranteed, jointly and severally, the obligations of P.R.T. to Dollar under the Richmond Master Lease Agreement.  (Agreed Pretrial Or., 7, ¶¶ 18-20; Pl.'s Exs. 31-33.)

17.     On September 15, 1999, Dollar and P.R.P. entered into a License Agreement, permitting P.R.P. to operate a vehicle rental business in the Counties of Mobile, Baldwin, Jefferson, Walker, Blount, Saint Clair and Shelby in the State of Alabama, using the Dollar trade name, service marks, and methods of operation, in exchange for payment of certain fees and charges, including systems fees, and with interest and late charges incurred for overdue amounts (the "Alabama License Agreement".)  (Agreed Pretrial Or., 7, ¶ 21; Pl.'s Ex. 35.)

18.     Mr. Moraes personally guaranteed the performance by  P.R.P. of all of its duties and obligations to Dollar under the Alabama License Agreement.  (Agreed Pretrial Or., 7, ¶ 22; Pl.'s Ex. 37.)

19.     On September 15, 1999, in connection with the Alabama License Agreement, Dollar and P.R.P. entered into a Master Lease Agreement allowing P.R.P. to lease vehicles from Dollar at certain specified locations upon payment to Dollar of a monthly lease rate for

each vehicle included under the lease (the "Alabama Master Lease Agreement".)   (Agreed Pretrial Or., 7, ¶ 23; Pl.'s Ex. 36.)

20.     On September 15, 1999, Mr. Moraes personally guaranteed the obligations of P.R.P. to Dollar under the Alabama Master Lease Agreement.  (Agreed Pretrial Or., 7, ¶ 24; Pl.'s Ex. 37.)

C.      <u>Defendants' Review of Agreements and Prior Business Experience</u>

1.      Prior to entering into each License Agreement with Dollar, P.R.P. or P.R.T., as was the case, received a Franchise Offering Circular, advising them that "THIS OFFERING CIRCULAR AND ALL CONTRACTS AND AGREEMENTS SHOULD BE READ CAREFULLY IN THEIR ENTIRETY FOR AN UNDERSTANDING OF ALL RIGHTS AND OBLIGATIONS OF BOTH THE FRANCHISOR AND THE FRANCHISEE." (Agreed Pretrial Or., 8, ¶ 26.)

2.      On August 26, 1991, Dollar sent a letter to P.R.P. regarding closing on the Pensacola franchise. That letter provided, "The Purchaser [P.R.P.] hereby confirms that he has read the Dollar offering circular and License Agreement." (Agreed Pretrial Or., 8, ¶ 27; Pl.'s Ex. 5.)

3.      Mr. Moraes, on behalf of P.R.P., accepted the Pensacola closing letter on August 27, 1991.  (Agreed Pretrial Or., 8, ¶ 28; Pl.'s Ex. 5.)

4.      On September 24, 1992, counsel for Dollar sent a letter to Mr. Taddei and Mr. Moraes enclosing certain documents in connection with P.R.T.'s acquisition of the Norfolk franchise.  That letter advised Mr. Taddei and Mr. Moraes to "review the enclosed documents and to consult with your legal counsel."  (Agreed Pretrial Or., 8, ¶ 29.)

5.      In Brazil, Mr. Moraes worked for IBM for five years in a sales role, starting as a sales trainee and leaving as a regional manager.  (Tr. Transcr., vol. 4, 528 (Moraes Cross) (Sept. 16, 2004).)

6.      Subsequent to his employment with IBM in Brazil, Mr. Moraes ran a retail fashion business, opening four stores and operating a small manufacturing company.  While running the fashion business, Mr. Moraes had occasion to read and enter into contracts.  (Tr. Transcr., vol. 4, 529-530 (Moraes Cross).)

7.      After the fashion business, Mr. Moraes was hired by Nobre rental car company to develop a nationwide car rental system.  He was very successful, as Nobre became the largest car rental company in Brazil.  (Tr. Transcr., vol. 4, 530-531 (Moraes Cross).)

8.      While employed by Nobre, Mr. Moraes was in charge of franchising, sales, and operations.  Nobre had approximately 40 car rental franchisees, and Mr. Moraes was familiar with the terms of Nobre's franchise agreements.  (Tr. Transcr., vol. 4, 531-532 (Moraes Cross).)

9.      Mr. Moraes was also responsible for the negotiation of acquisition agreements dealing with car rental locations.  (Tr. Transcr., vol. 4, 534-535 (Moraes Cross).)

10.     After Mr. Moraes left Nobre, he was the master franchisee for Budget Rent A Car in Brazil. He was responsible for overseeing approximately 40 franchise locations and owned 38% of the company.  He frequently signed agreements on behalf of the company.  (Tr. Transcr., vol. 4, 535-536 (Moraes Cross).)

11.     When Mr. Moraes left Budget, he became the head of Dollar Rent A Car in Brazil.  (Tr. Transcr., vol. 4, 537 (Moraes Cross).)

12.     Mr. Moraes was a sophisticated businessman, with years of experience in the vehicle rental business gained while living in Brazil, when he executed the Pensacola License

Agreement on behalf of P.R.P. with Dollar in 1991.  (Tr. Transcr., vol. 1, 54  (Nargi Direct); Tr. Transcr. , vol. 4, 528-538 (Moraes Cross).)

13.     Mr. Moraes had 15 days to review the Pensacola license agreement and master lease agreement.  (Tr. Transcr., vol. 4, 538 (Moraes Cross).)

14.     Dollar provided Mr. Moraes with a franchise offering circular disclosure at least a month prior to executing any agreements.  (Tr. Transcr., vol. 4, 538-539 (Moraes Cross).)

15.     In every significant conversation Mr. Moraes had with Dollar concerning negotiations, an interpreter was present for Mr. Moraes.  Moreover, Mr. Nargi was personally involved in negotiations with Mr. Moraes in connection with the Pensacola location and he was able to communicate with him.  Mr. Moraes never stated to Mr. Nargi that he did not understand the agreements.  (Tr. Transcr., vol. 4, 540-543 (Moraes Cross); Tr. Transcr., vol. 5, 877-878 (Nargi Rebuttal).)

16.     Prior to acquiring the Pensacola Dollar franchise, Mr. Moraes had enough money to hire someone to translate the acquisition documents into Portugese.  (Tr. Transcr., vol. 4, 543-544 (Moraes Cross).)

17.     When Mr. Moraes had his initial discussions with Dollar in 1991, he advised Dollar of his previous experience in the car rental business.  (Tr. Transcr., vol. 4, 553 (Moraes Cross); Pl.'s Ex. 1.)

18.     Mr. Moraes paid an attorney to review the Pensacola License Agreement, three months after he signed it.  (Agreed Pretrial Or., 8, ¶ 30; Tr. Transcr., vol. 4, 546 (Moraes Cross).)

19.     Mr. Moraes subsequently executed the Norfolk and Richmond License Agreements, on behalf of P.R.T., and the Alabama License Agreement, on behalf of P.R.P.

He reviewed these agreements before signing them.  He chose not to hire an attorney to review these Agreements, in reliance on the prior legal review of the Pensacola License Agreement and the similarities among the License Agreements.  (Agreed Pretrial Or., 8, ¶ 31; Tr. Transcr., vol. 4, 414-415 (Moraes Direct), 547-550 (Moraes Cross); Pl.'s Exs. 14, 29 & 35.)

20.     No one with Dollar ever misrepresented to Mr. Moraes that the license agreements did not contain a provision dealing with consequential damages.  (Tr. Transcr., vol. 4, 550 (Moraes Cross).)

21.     When negotiating the various agreements with Dollar, the only modification Mr. Moraes ever requested dealt with the computer system.  (Tr. Transcr., vol. 4, 551-552 (Moraes Cross).)

22.     In the Pensacola License Agreement and the Master Lease Agreement, the consequential damages provision is in the same size print as the rest of the contracts and is no darker or lighter than the rest of the contracts.  Mr. Moraes does not believe that Dollar had any intent to hide the consequential damages provision from him.  Mr. Moraes does not believe that Dollar had any intent to hide any provisions of the contracts from him.  (Tr. Transcr., vol. 4, 552-553 (Moraes Cross).)

23.     Mr. Taddei was a sophisticated businessman with experience operating Texaco franchises when he became involved with Dollar through P.R.T. (Tr. Transcr., vol. 1,  59 (Nargi Direct).)

24.     Currently, Mr. Taddei operates eight Texaco franchises pursuant to license agreements.  Prior to entering into the Texaco franchises, Mr. Taddei had the opportunity to consult with an attorney but chose not to.  He never uses an advisor, consultant, or attorney. (Agreed Pretrial Or., 9, ¶ 33-34.)

25.     Mr. Moraes was a "hands-on" business owner, who kept strict control of the Corporate Defendants' cash.  Mr. Moraes was responsible for the financing of the businesses and most negotiations with creditors.  (Agreed Pretrial Or., 9, ¶ 35.)

D.     General Terms of Agreements

1.     Because the Corporate Defendants entered into the License Agreements on different dates, the License Agreements and the Master Lease Agreements vary slightly in certain respects.   The general provisions set forth in the Pensacola and the Norfolk License Agreements are the same but differ slightly from the general provisions used in the Richmond and Alabama License Agreements.  (Agreed Pretrial Or., 7-8, ¶ 25; See Pl.'s Exs. 8, 14, 29 & 35.)  Similarly, the general provisions of the Pensacola and Norfolk Master Lease Agreements are the same but differ slightly from the general provisions used in the Richmond and Alabama Master Lease Agreements.  (Agreed Pretrial Or., 7-8, ¶ 25; See Pl.'s Exs. 9, 15, 19, 30 & 36.)

2.     Any legal action or proceeding arising out of the Agreements is governed by Oklahoma law.  (Pl.'s Exs. 8, 14, 29 & 35 at ¶ 24.1;  Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 14.)

3.     According to the terms of the License Agreements and Master Lease Agreements, the Corporate Defendants may not seek consequential damages or lost profits from Dollar in the event of any termination of the License Agreements.  (Tr. Transcr., vol. 1, 85-86 (Nargi Direct); Pl.'s Exs. 8, 14, 29 & 35 at ¶ 24.8, and Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 12.)

4.     According to the terms of the License Agreements and Master Lease Agreements, the Corporate Defendants must bear the costs of actual attorneys' fees together with court costs and expenses of any action Dollar institutes to enforce the terms of such

Agreements or any other agreement that is part of the franchise relationship. (Tr. Transcr., vol. 1, 204-205 (Manning Direct); Pl.'s Exs. 8, 14, 29 & 35 at ¶ 24.7.)

5.      According to the terms of the License Agreements and Master Lease Agreements, the parties to the License Agreements are independent contractors and any assistance provided by Dollar to the Corporate Defendants will not defeat such status.  (Pl.'s Exs. 8, 14, 29 & 35 at ¶ 24.11, and Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 12(B).)

6.      According to the terms of the License Agreements, the Corporate Defendants stated that, under the License Agreements, they "do not expect that the relationship created by [each License Agreement] is a relationship between principal and agent, or that it is a fiduciary relationship."  (Pl.'s Exs. 8, 14, 29 & 35 at ¶ 24.11)

7.      According to the terms of the License Agreements and the Master Lease Agreements, waiver by Dollar of any breach or series of breaches by the Corporate Defendants, or failure by Dollar to insist upon full compliance with the Corporate Defendants' obligations, does not constitute waiver of any subsequent breach or waiver of the performance of any of the Corporate Defendants' obligations. (Pl.'s Exs. 8, 14, 29 & 35 at ¶ 24.4, and Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 15(A).)

E.     <u>Payment Obligations</u>

1.      Pursuant to the License Agreements, the Defendants are obligated to pay Dollar System Fees, which are monthly non-refundable license fees calculated as a percentage of the Corporate Defendants' gross receipts.  The System Fees are calculated based on monthly revenue reports (self-reporting) prepared by the Corporate Defendants and delivered to Dollar. (Agreed Pretrial Or., 9, ¶ 37; Pl.'s Exs. 8, 14, 29 & 35 at ¶ 5.1.)

2.      Pursuant to the License Agreements, the Defendants are obligated to pay Dollar Reservations charges for car rental reservation services provided by Dollar.  (Agreed Pretrial Or., 9, ¶ 38; Pl.'s Exs. 8, 14, 29 & 35 at ¶ 9.)

3.      Pursuant to the License Agreements, the Defendants are obligated to reimburse Dollar for costs of Supplies, which are costs incurred by Dollar for shipping supplies and materials to the Corporate Defendants for use in the licensed business. (Agreed Pretrial Or., 9, ¶ 39; Pl.'s Exs. 8, 14, 29 & 35 at ¶ 5.4.)

4.      Pursuant to the License Agreements, the Defendants are obligated to reimburse Dollar for Travel Agent Commissions paid by Dollar on behalf of the Corporate Defendants, which commissions were paid to travel agents for booking reservations that resulted in actual car rentals with the Corporate Defendants.  (Agreed Pretrial Or., 9-10, ¶ 40; Pl.'s Exs. 8, 14, 29 & 35 at ¶ 11.20.)

5.      Pursuant to the License Agreements, the Defendants are obligated to reimburse Dollar for Override Commissions paid to preferred travel agents for booking reservations that resulted in actual car rentals with the Corporate Defendants.  (Agreed Pretrial Or., 10, ¶ 41; Pl.'s Exs. 8, 14, 29 & 35 at ¶ 11.20.)

6.      Pursuant to the License Agreements, the Defendants are obligated to reimburse Dollar for Frequent Flyer payments made by Dollar on behalf of the Corporate Defendants. (Agreed Pretrial Or., 10, ¶ 42; Pl.'s Exs. 8, 14, 29 & 35 at ¶ 11.23.)

7.      Pursuant to the License Agreements, the Defendants are obligated to pay Dollar Revenue Management charges for the Corporate Defendants' subscription to Rate Management Analyst Support services and information provided by Dollar.  (Agreed Pretrial Or., 10, ¶ 43.)

8.      Pursuant to the License Agreements, the Defendants are obligated to reimburse Dollar for Customer Adjustments, which represent amounts paid by Dollar on behalf of the Corporate Defendants in connection with complaints, overcharges by the Corporate Defendants, or similar claims by the Corporate Defendants' customers.  (Agreed Pretrial Or., 10, ¶ 44.)

9.      Pursuant to the License Agreements, the Defendants are obligated to reimburse Dollar for Goodwill Certificates provided by Dollar on behalf of the Corporate Defendants in connection with complaints, overcharges by the Corporate Defendants, or similar claims by the Corporate Defendants' customers.  (Agreed Pretrial Or., 10, ¶ 45.)

10.     Pursuant to the License Agreements, the Defendants are obligated to reimburse Dollar for intercity payments made by Dollar on behalf of the Corporate Defendants.  A credit in favor of the Corporate Defendants may result if the Corporate Defendants accepted return of vehicles rented from Dollar licensees in other cities.  (Agreed Pretrial Or., 10, ¶ 46.)

11.     Pursuant to the License Agreements, the Defendants may be entitled to Product Promotion Allowance ("PPA") Credits, which represent payments from DaimlerChrysler, received by Dollar on behalf of the Corporate Defendants, for advertisements by the Corporate Defendants that include, among other things, reference to DaimlerChrysler vehicles.  (Agreed Pretrial Or., 11, ¶ 47.)

12.     Pursuant to the License Agreements, the Defendants are obligated to pay Dollar a Finance Charge, whereby all overdue payments accrue interest at the rate of two percent (2%) per month or the highest rate permitted by law, whichever is less.  (Agreed Pretrial Or., 11, ¶ 48; Pl.'s Exs. 8, 14, 29 & 35 at ¶ 5.2.)  Although the License Agreements permit Dollar to assess interest at the rate of two percent (2%) per month, Dollar has only assessed interest

on the Corporate Defendants' overdue payments at the rate of one and one-half percent (1½%) per month.  (Agreed Pretrial Or., 11, ¶ 48.)

13.     Pursuant to Master Lease Agreements, the Defendants are obligated to pay Dollar Fleet charges (which include monthly lease charges based on a specified rate for each vehicle leased or subleased by the Corporate Defendants from Dollar, fleet program debit memos), costs incurred in connection with auction of the Corporate Defendants' leased vehicles at the end of the lease term, invoices for any leased vehicles rejected at auction (typically due to damage), and miscellaneous charges related to fleet (e.g., repossession expenses.)  (Agreed Pretrial Or., 11, ¶ 49; Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 1(C) & 8(A).)

14.     Pursuant to the Master Lease Agreements, the Defendants are obligated to pay Dollar a Finance Charge, whereby all overdue payments accrue interest at the rate of eighteen percent (18%) per annum or the highest rate permitted by law, whichever is less.  (Agreed Pretrial Or., 11, ¶ 50; Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 15(D).)

15.     Pursuant to the Master Lease Agreements, the Defendants are obligated to pay Dollar a Late Charge equal to five percent (5%) on any amounts not paid when due under the Master Lease Agreements.  (Agreed Pretrial Or., 11-12, ¶ 51; Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 1(C).)  Notwithstanding the fact that the Master Lease Agreements permit Dollar to assess this Late Charge on all overdue amounts, Dollar has only assessed the Late Charge on the monthly fleet lease rental payments which were not paid when due by the Corporate Defendants prior to termination of the Master Lease Agreements.  (Agreed Pretrial Or., 11-12, ¶ 51.)

16.     The Defendants are entitled to Unapplied Credits for any amounts paid by or on behalf of the Corporate Defendants for which amounts the Corporate Defendants have failed to specify how such payments should be applied towards amounts owed.  (Agreed Pretrial Or., 12, ¶ 52.)

F.      Franchise Statements of Account

1.      Pursuant to the License Agreements, the Corporate Defendants operated Dollar franchises in five cities, Pensacola, Florida; Norfolk, Virginia; Richmond, Virginia; Mobile, Alabama; and Birmingham, Alabama. (Agreed Pretrial Or., 12, ¶ 53; Pl.'s Exs. 8, 14, 29 & 35, Attachment A.)   In two of these cities, Pensacola and Norfolk, the Corporate Defendants operated both on-airport and off-airport locations.   The accounting system utilized by Dollar maintains the accounts of the Corporate Defendants electronically by location; therefore, there are seven accounts (four for P.R.P. and three for P.R.T.)  (Agreed Pretrial Or., 12, ¶ 53; Tr. Transcr., vol. 1, 170-171 (Manning Direct).)

2.      Because the Corporate Defendants operated seven licensed locations (five on-airport and two off-airport), Dollar sent seven Franchise Statements of Account to the Corporate Defendants on a monthly basis in the ordinary course of business.  (Agreed Pretrial Or., 12-13, ¶ 57; Tr. Transcr., vol. 1, 170-171 (Manning Direct).)   The monthly Franchise Statements of Account delivered by Dollar apprise each licensee of the status of its Dollar account(s) and notify each licensee of due and/or past due payments. (Agreed Pretrial Or., 12-13, ¶ 57; Tr. Transcr., vol. 1, 173 - 177 (Manning Direct); Pl.'s Ex. 75)

3.      The Franchise Statements of Account contain a line-by-line identification of each charge or credit applied to the licensee's account during the relevant time period.   The Franchise Statements of Account also contain detailed information with respect to each charge that remains outstanding and unpaid on the account. (Agreed Pretrial Or., 12, ¶ 55; Pl.'s Exs. 75 & 76.)

4.      The Franchise Statements of Account identify, by invoice number and invoice date, the invoice pertaining to each separate charge or credit. (Agreed Pretrial Or., 12, ¶ 56;

Pl.'s Exs. 75 & 76.)  Most of the invoices that underlie the Statements of Account are provided

separately to Dollar licensees.  (Agreed Pretrial Or., 12, ¶ 56; Tr. Transcr., vol. 1, 169 -170.)

Additionally, Dollar Credit and Collections employees will fax invoices to licensees upon

request.  (Agreed Pretrial Or., 12, ¶ 56.)

G.      Default Provisions

        1.      According to the Master Lease Agreements, an "Event of Default" exists if the

Corporate Defendants fail to pay in full any lease payments on the date they are due.  (Tr.

Transcr., vol. 1, 74 (Nargi Direct); Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 9(A).)

        2.      According to the Master Lease Agreements, Dollar may terminate the Master

Lease Agreements without prior notice upon the occurrence of an "Event of Default."  (Tr.

Transcr., vol. 1, 75 (Nargi Direct); Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 9(C).)

        3.      According to the Pensacola and the Norfolk License Agreements, Dollar may

terminate these Agreements for "good cause."  "Good cause" includes, but is not limited to,

the specific defaults listed in such Agreements.  (Tr. Transcr., vol. 1, 80-81 (Nargi Direct);

Pl.'s Exs. 8 & 14 at ¶ 18.3.)

        4.      According to the Pensacola and the Norfolk License Agreements, Dollar may

terminate these Agreements, effective upon delivery of notice, if, inter alia, any of the

following occur:   (a) the failure of the Corporate Defendants to cure a default under a

collateral agreement with Dollar, such as the Master Lease Agreement; (b) the insolvency of

the Corporate Defendants or the inability of the Corporate Defendants to pay their debts as

they come due; or (c) the failure of the Corporate Defendants, on three or more separate

occasions during any twelve-month period, to comply with provisions of these Agreements,

including the obligations to pay various fees when due.  (Tr. Transcr., vol. 1, 81-82 (Nargi Direct); Pl.'s Exs. 8 & 14 at ¶ 18.4(c), (l) & (m).)

5.       According to the Pensacola and the Norfolk License Agreements, Dollar may also terminate these Agreements, effective upon expiration of the cure period, if, inter alia, the Corporate Defendants fail to pay any monies due under these Agreements or under any collateral agreement within three days after written notice.  (Pl.'s Exs. 8 & 14 at ¶ 18.4(p).)

6.       According to the Richmond and the Alabama License Agreements, Dollar may terminate these Agreements for "cause," which includes, but is not limited to, the specific defaults set forth in these Agreements.  (Pl.'s Exs. 29 & 35 at ¶ 18.2.)

7.       According to the Richmond and the Alabama License Agreements, in certain specified circumstances, the Richmond and the Alabama License Agreements terminate automatically and without notice to the Corporate Defendants.   For instance, automatic termination occurs if the Corporate Defendants become insolvent or are unable to pay their debts as they come due.  (Tr. Transcr., vol. 1, 83-84 (Nargi Direct); Pl.'s Exs. 29 & 35 at ¶ 18.3.)

8.       According to the Richmond and the Alabama License Agreements, Dollar may terminate these Agreements for cause, effective upon delivery of notice, if, inter alia, any of the following occurs: (a) a default under any other agreement between the Corporate Defendants and Dollar, such as the Master Lease Agreement; or (b) the failure of the Corporate Defendants to comply with these Agreements on three separate occasions during any 12-month period, including a failure to pay when due, license fees, advertising assessments, reservation fees or other payments.  (Tr. Transcr., vol. 1, 84-85 (Nargi Direct); Pl.'s Exs. 29 & 35 at ¶ 18.4(b) & (f).)

9.      According to the Richmond and the Alabama License Agreements, Dollar may terminate these Agreements for cause, effective upon expiration of the cure period, if <u>inter alia</u>, the Corporate Defendants fail to pay Dollar any monies due under these Agreements or any collateral agreement within three (3) days after written notice to the Corporate Defendants.  (Pl.'s Exs. 29 & 35 at ¶ 18.4(i).)

10.      According to the Richmond and the Alabama License Agreements, any description of default in any notice provided by Dollar to the Corporate Defendants does not preclude Dollar from specifying additional or supplemental defaults in any action, hearing, or suit relating to the Richmond and the Alabama License Agreements or their termination.  (Pl.'s Exs. 29 & 35 at ¶ 18.4.)

H.      <u>Defendants' Financial Condition in 2001</u>

1.      The revenue generated by the Corporate Defendants was generally cyclical throughout their ten year relationship with Dollar.  Usually, revenue was down in the winter, and the Corporate Defendants would "catch up" on payments to Dollar over the summer. (Tr. Transcr., vol. 1, 64-65, 69-70 (Nargi Direct); Tr. Transcr., vol. 5 673-674 (Moraes Redirect) (Sept. 17, 2004); Transcr. Depo. Charles Bratcher, 123-124 (Nov. 26, 2002)[2]; Pl.'s Ex. 46.) Throughout its relationship with the Corporate Defendants, Dollar attempted to work with the Corporate Defendants and their cash flow cycles.  (Pl.'s Exs. 38, 39, 41 & 43.)  On several occasions, in response to a request from Moraes, Dollar extended credit to the Corporate Defendants, in effect, funding the businesses.  (Pl.'s Exs. 22 & 43.)

---

[2]  The testimony of Tara Doerr, Charles Bratcher, Wayne Shank, Steven Owen, Alice Madison, Mary Mindingall, Thomas Borzilleri, Cheryl Helfricht and Steve Ganas was presented to the Court by way of deposition designation because the witnesses were not "available" for trial within the meaning of Fed. R. Evid. 804.

2.      In March of 2001, Mr. Moraes offered to sell his Virginia territories to Dollar for $2,200 per car.  (Tr. Transcr., vol. 1, 67-68, 71-72 (Nargi Direct); Pl.'s Exs. 40 & 235.) Dollar turned the offer down primarily because (1) the businesses were losing money; and (2) acquiring the Virginia territories was not part of Dollar' strategies (airports were not large enough). (Tr. Transcr., vol. 1, 67-69 (Nargi Direct); Pl.'s Ex. 42.)

3.      Also, in the Spring of 2001, P.R.P. and P.R.T. fell behind in their payments due under the License Agreements.  Dollar required Mr. Moraes to work out a payment plan to force P.R.P. and P.R.T. to get and keep their obligations to Dollar current.  (Tr. Transcr., vol. 1, 66 (Nargi Direct); Tr. Transcr., vol. 5, 590-591, 658 (Moraes Cross), 703-704 (Moraes Recross); Tr. Transcr., vol. 6, 881-883 (Nargi Rebuttal) (Sept. 23, 2004); Pl.'s Ex. 43.) Through June of 2001, the Corporate Defendants managed to pay the amounts agreed to under the plan; however, they fell behind again during the Summer of 2001 – missing June, July, and August payments due under the License Agreements.  (Tr. Transcr., vol. 1, 131-132 (Davis Direct), 177-178 (Manning Direct); Tr. Transcr., vol. 5, 591 (Moraes Cross); Pl.'s Exs. 76 & 128.)

4.      By September 1, 2001, the Corporate Defendants owed Dollar approximately $560,000 for payments due under the License Agreements.  (Pl.'s Ex. 53 & 54.)  Dollar's concerns over this debt were heightened due to the cyclical nature of the business and the fact that the summer months were typically the greatest revenue-generating months.  (Tr. Transcr., vol. 1, 69-70 (Nargi Direct); Tr. Transcr., vol. 5, 878-879 (Nargi Direct); Pl.'s Ex. 41, 46.)

5.      Mr. Moraes put together a plan the day after September 11, 2001.  In this plan, he describes the elimination of certain employees, getting rid of a lot of cars, and taking advantage of "the moment" to get concessions from vendors and financial sources.  (Tr. Transcr., vol. 4, 555-556, 559-560 (Moraes Cross); Pl.'s Ex. 215.)

6.     As of September 12, 2001, Mr. Moraes' companies were 3 months late paying some bills to Dollar.  (Tr. Transcr., vol. 4, 560 (Moraes Cross).)

7.     After September 11, 2001, with respect to past due amounts owed to Dollar, Mr. Moraes decided to "wait and see" what Dollar would be offering in terms of deferring payments.  (Tr. Transcr., vol. 4, 560-561 (Moraes Cross); Pl.'s Ex. 215.)

8.     As of September 21, 2001, the Corporate Defendants, and Mr. Moraes and Mr. Taddei, as guarantors, owed Capital Auto Rental Services $1,675,921.24, as a result of selling cars at auction that were out of trust and depositing the proceeds in the Corporate Defendants' bank account.  In Mr. Moraes' September 12, 2001 plan, he stated the following intent with respect to Capital Financial Services:  "to squeeze them just enough to keep them without do any hard movement since we are not going to use them anymore."  At trial, he explained that statement by saying "we were playing hard."  (Tr. Transcr., vol. 4, 561-565 & vol. 5, 641 (Moraes Cross); Pl.'s Exs. 205, 215.)

9.     Another one of the Corporate Defendants' loans was with Manheim Financial Services.  Mr. Moraes also planned to squeeze Mannheim a little bit, if they allowed him to do so.  (Tr. Transcr., vol. 4, 567 (Moraes Cross); Pl.'s Ex. 215.)  Steve Ganas, inventory control manager of Manheim Automotive Financial Services, Inc., testified that Manheim provided floor plan financing to PRP/PRT and that PRP owed approximately $17,000 plus accrued interest to Manheim as of September 15, 2001 on the basis of a prior workout agreement and that PRT owed approximately $14,000 to Manheim as of September 15, 2001 for actual fleet and that these September 15 payments were not made.   (Transcr. Depo. Ganas, 4, 8-9, 14, 29-31, 33-34 (Dec. 12, 2002).)

10.     Thomas Borzilleri, chief executive officer of Fleetplan Capital (successor-in-interest to Signature Automotive Group and Prime One Capital), testified that Signature

Automotive Group provided vehicles to PRP and that, prior to May, 2001, PRP never made any payments late.  (Transcr. Depo. Borzilleri, 7-8, 10, 32-33 (Dec. 30. 2002); Pl.'s Ex. 201.) However, as of September 19, 2001, the total overdue amount owed by PRP to Signature Automotive Group was in the range of $150,000 to $180,000.  (Transcr. Depo. Borzilleri, 37.)

11.     Cheryl Helfricht, lease administrator of Rosedale Leasing, Walden Leasing, and Walden Fleet Services II, Inc., testified that these entities leased fleet to PRP and PRT. (Transcr. Depo. Helfricht, 7, 9-10, 13 (Dec. 23, 2002)).   PRP and PRT never missed a payment until the one due on September 15, 2001 in the amount of approximately $120,000. (Transcr. Depo. Helfricht, 22-26; Pl.'s Ex. 203.)    PRP and PRT did not dispute the amount owed to these entities.  (Transcr. Depo. Helfricht, 26-27.)

12.     In July, 2001, the Corporate Defendants were in default to Finova and owed $327,000.  (Tr. Transcr., vol. 5, 599-600 (Moraes Cross); Pl.'s Ex. 204.)

13.     After September 11, 2001, Mr. Moraes intended to pay the airport bills late because all the airports, with the exception of Pensacola, would allow late payments.  (Tr. Transcr., vol. 4, 567-568 (Moraes Cross); Pl.'s Ex. 215.)

14.     Alice Madison, financial administrator for the Mobile Airport Authority, testified that PRP had a car rental agreement with the airport and that, as of August 31, 2001, PRP owed over $56,000 to the airport, which amount was never paid.  (Transcr. Depo. Madison, 7, 12-13, 19, 29-30, 35-36 (Dec. 10, 2002); Pl.'s Ex. 191.)

15.     Wayne Shank, deputy executive director of the Norfolk Airport Authority, testified that PRT had a rental car concessionaire agreement with the Authority and had the worst delinquent payment history of any operator at the Airport, requiring collection notices and threat of legal action before PRT would respond.  (Transcr. Depo Shank, 3, 7, 15, 19-21, 23-25 (Dec. 4. 2002).)  As of September 19, 2001, certain amounts were past due and owing

by PRT to the Authority and PRT was in default of its agreement with the Authority. (Transcr. Depo Shank, 19, 32-36.)   Mr. Moraes admitted that, from April, 2001 through September, 2001, the Corporate Defendants owed past due amounts to the Norfolk Airport Authority ranging from $107,000 to $134,000.  (Tr. Transcr., vol. 5, 592-594 (Moraes Cross); Pl.'s Exs. 181-184.)

16.    Mary Mindingall, director of properties and administration for the Birmingham Airport Authority, testified that PRP owed at least $28,533.58 to the airport on September 10, 2001 and that the debt was never paid. (Transcr. Depo. Mindingall, 34-35, 38-39 (Dec. 11, 2002); Tr. Transcr., vol. 5., 596-597 (Moraes Cross); Pl.'s Exs. 185-187.)

17.    Stephen C. Owen, director of finance at the Capital Region Airport Commission, the owner and operator of the Richmond International Airport, testified that PRT had both a concessionaire agreement and a customer facility charge agreement with the Airport.  (Transcr. Depo. Owen, 3, 7, 15-17 (Dec. 5, 2002).)  As of September 19, 2001, PRT owed the Airport approximately $245,000, for amounts, some of which related back to May, 2001.  (Transcr. Depo. Owen, 24-27, 29; Tr. Transcr., vol. 5, 597-98 (Moraes Cross).)

18.    PRP failed to pay rent owed to the City of Pensacola for July, 2001, as stipulated under the terms and conditions of the Rental Car Concession Agreement between PRP and the City.  Mr. Moraes was sent written notice of the default on July 5, 2001; Dollar received notice as well.  (Pl.'s Ex. 179.)

19.    Mr. Moraes testified that there were a lot of debts past due that needed to be paid on September 18 and that the amount of past due monies owed was a lot more than $400,000.  (Tr. Transcr., vol. 5, 626 (Moraes Cross).

20.     Mr. Moraes estimated that the Corporate Defendants needed $600,000 additional capital to stay in business for the next 90 days.  (Tr. Transcr., vol. 4, 570-71 (Moraes Cross).)

21.     Mr. Wilsey testified that the Corporate Defendants needed a capital infusion of at least $3 million in September, 2001 to have survived.  (Tr. Transcr., vol. 6, 904-905 (Wilsey Rebuttal).)

22.     As of September 18, 2001, Mr. Moraes did not have any loan applications pending with banks on behalf of the Corporate Defendants.  (Tr. Transcr., vol. 5, 601-602 (Moraes Cross); Tr. Transcr., vol. 2, 250-251 (Wilsey Direct).)

23.     The negative equity position of the Corporate Defendants throughout the summer of 2001, the revenue lost as a result of September 11, the lack of investment in the Corporate Defendants by the Individual Defendants, and the Corporate Defendants' accumulation of non-Dollar related debt (the largest amounts were owed to other fleet vendors and airport authorities) were disastrous for P.R.P. and P.R.T.  (Tr. Transcr., vol. 2, 252-253, 256-260, 266-267, 300 (Wilsey Direct) (Sept. 14, 2004); Pl.'s Ex. 136, 141, 143, 144.)

24.     By September of 2001, the accounts payable of PRP had risen from $200,197 (in January, 2001) to $1,405,000.  In addition, the payables over 60 days old in January of 2001 were $35,000, as compared to payables over 60 days old in September of 2001 of $620,418.  (Tr. Transcr., vol. 2, 260-261 (Wilsey Direct); Pl.'s Ex. 145.)

25.     By September of 2001, the accounts payable of PRT had risen from $470,000 (in January, 2001) to $902,000.  (Tr. Transcr., vol. 2, 261 (Wilsey Direct); Pl.'s Ex. 147.)

26.     As of September 19, 2001, the Corporate Defendants were insolvent, did not have the ability to continue as a going concern, and were not able to pay their debts as they became due.  (Tr. Transcr., vol. 2, 247, 266-267, 275-276 (Wilsey Direct).)

I.     <u>Termination</u>

1.     The Corporate Defendants' fleet payments to Dollar were due on the 15th day of each month, but, since September 15, 2001, fell on a Saturday, the September fleet payment was due on Monday, September 17, 2001.  (Tr. Transcr., vol. 1, 136-137 (Davis Direct), 178-179 (Manning Direct); Tr. Transcr., vol. 4, 561, 651 (Moraes Cross); Pl.'s Ex. 216.)

2.     On September 17, 2001, the same day that the fleet payment was due, Mr. Moraes called Mr. Nargi to discuss selling to Dollar certain of his vehicle rental locations. (Tr. Transcr., vol. 5, 618-619 (Moraes Cross).)  This was the same offer that Mr. Moraes had made to Dollar in March, 2001 and that had been rejected by Dollar then.   Dollar again rejected Mr. Moraes' offer.  (Tr. Transcr., vol. 1, 71-72 (Nargi Direct); Pl.'s Ex. 235.)

3.     Also, on September 17, 2001, Mr. Moraes spoke with Troyce Davis, a Dollar collector, concerning his financial situation.  He told her that he was applying for a loan from his bank, that everything has not been completed, but he should know something by tomorrow.  He also stated that he could not make his fleet payment on September 17, 2001. Ms. Davis told Mr. Moraes that a repo letter would go out if he did not make the fleet payment that day.  Ms. Davis took contemporaneous notes of her conversation and recorded her notes on a phone log.  (Tr. Transcr., vol. 1, 133-134, 136-138 (Davis Direct); Pl.'s Ex. 108.)

4.     Also, on the afternoon of September 17, 2001, Linda Adair, a Dollar collector, spoke to Pedro Moraes.  Mr. Moraes told her that he was having cash flow problems; he was meeting with his bankers; and that he didn't have enough money to make the fleet payment and pay his taxes.  Mr. Moraes was aware that if he didn't send the fleet payment, then he would receive a repo letter.  (Tr. Transcr., vol. 1, 159-160 (Adair Direct).)

5.     On September 17, 2001, the Corporate Defendants failed to pay their September fleet payment (in the amount of $273,570.25) to Dollar, for vehicles leased during the month of August 2001, and, unlike prior occasions, the Corporate Defendants could not provide Dollar evidence that the fleet payment had been sent to Dollar.   (Agreed Pretrial Or., 13, ¶ 60; Tr. Transcr., vol. 1, 73 (Nargi Direct), 159 (Adair Direct), 168-169 (Manning Direct); Tr. Transcr., vol. 5, 625-626 (Moraes Cross).)

6.     It is uncommon for licensees to miss fleet payments, because licensees obviously need vehicles for operation of their business.  Additionally, a missed fleet payment triggers immediate concern by Dollar about its collateral – vehicles leased by the licensees. (Tr. Transcr., vol. 1, 165-167 (Manning Direct).)

7.     Therefore, missing the fleet payment in September 2001 was an extraordinary occurrence in the parties' relationship.  (Tr. Transcr., vol. 1, 168-169 (Manning Direct).)

8.     Mr. Moraes testified that the reason he did not pay the Dollar fleet bill on September 18 (and, presumably, on September 17) was to "improve his forecast for the month."  (Tr. Transcr., vol. 5, 626 (Moraes Cross).)

9.     On September 18, 2001, Troyce Davis spoke to Tara Doerr, the PRP/PRT bookkeeper and Ms. Doerr told her that Mr. Moraes let the entire accounting staff go on September 17.  (Tr. Transcr., vol. 1, 140 (Davis Direct); Pl.'s Ex. 108.)

10.     On September 18, 2001, Dollar notified the Corporate Defendants in writing that the Master Lease Agreements would terminate on September 21, 2001, unless outstanding invoices were paid in full.  (Agreed Pretrial Or., 15, ¶ 75.)   Cathy Manning waited until she had spoken with Mr. Moraes by phone to fax the standard letter, so it was sent after that phone call, around 6:30 in the evening.  (Tr. Transcr. vol. 1, 182-183 (Manning Direct).)  Dollar was not required to offer this three-day cure period in the letter because the Master Lease

Agreements permitted Dollar to terminate them immediately upon the Corporate Defendants' failure to make a fleet payment when due.  (Tr. Transcr., vol. 1, 73-76 (Nargi Direct); Pl.'s Ex. 48.)

11.     Dollar's representation in its September 18, 2001 letter, that a three-day cure period would be allowed for the Defendants to remit past due payments owed under the Master Lease Agreements, was true when made.  (Tr. Transcr., vol. 1, 73-76 (Nargi Direct); Pl.'s Ex. 48.)

12.     On the morning of September 19, 2001, Mr. Moraes left a voice mail for Troyce Davis before she got to work.  He stated that he was on his way to the office, would check his bank balance, and call her back and that he was planning to send payment today for the fleet and possibly part of the system fees; he claimed he was working with his bank to secure a loan to pay the entire amount.  (Tr. Transcr., vol. 1, 141 (Davis Direct); Pl.'s Ex. 108.)

13.     On the morning of September 19, 2001, Mr. Moraes spoke by phone with Cathy Manning, Dollar Director of Credit and Collections, concerning the outstanding indebtedness to Dollar.  Mr. Moraes told Ms. Manning that the Defendants were unable to pay past due amounts to Dollar unless Dollar bought his locations.  (Tr. Transcr., vol. 1, 76 (Nargi Direct); Tr. Transcr. , vol. 2, 192-195 (Manning Direct); Pl.'s Exs. 55 & 62.)

14.     After Ms. Manning's conversation with Mr. Moraes, Ms. Manning told Ms. Davis that Mr. Moraes was not going to be able to send the money and that a termination letter would be prepared.   (Tr. Transcr., vol. 1, 142 (Davis Direct); Tr. Transcr., vol. 2, 195 (Manning Direct).)

15.     Mr. Nargi also spoke with Mr. Moraes on the morning of September 19, 2001 concerning the outstanding indebtedness to Dollar.   Mr. Moraes told Mr. Nargi that Defendants were unable to pay and that he needed to speak with his lawyer. (Tr. Transcr., vol.

1, 76-77 (Nargi Direct); Pl.'s Ex. 55.)  If, on September 19, 2001, Mr. Moraes had told Mr. Nargi that the fleet bill would be paid by September 21, 2001, then Dollar would not have terminated the License Agreements.  (Tr. Transcr., vol. 6, 885 (Nargi Rebuttal).)

16.     Mr. Nargi also received a call from Mr. Taddei on September 19, 2001, wherein Mr. Taddei stated that "he didn't realize how bad it was until recently" and the Corporate Defendants would probably have to file for bankruptcy.  (Tr. Transcr., vol. 1, 77-78 (Nargi Direct); Pl.'s Ex. 55.)

17.     Dollar delivered its September 18, 2001 letter (allowing a three-day period) to the Defendants pursuant to Dollar's then-standard practice.  (Tr. Transcr., vol. 1, 73-76 (Nargi Direct), 162 (Adair Cross), 166 (Manning Direct).)  Dollar subsequently withdrew the three-day cure period in response to Mr. Moraes' statements that the Defendants could not pay all amounts owed to Dollar and Mr. Taddei's indication that the Corporate Defendants' dire financial condition might force them into bankruptcy.  (Agreed Pretrial Or., 15, ¶ 76; Tr. Transcr., vol. 1, 76-79 (Nargi Direct), 98, 106 (Nargi Cross), 143-144 (Davis Direct); Tr. Transcr., vol. 2, 192-194 (Manning Direct); Pl.'s Exs. 49 & 55.)

18.     In addition, on September 19, 2001, Dollar notified the Corporate Defendants in writing of the immediate termination of the License Agreements, due to termination of the Master Lease Agreements.  These notifications were specifically made without prejudice to Dollar's right to take action upon defaults not listed or upon defaults occurring after the date of the letters.  (Agreed Pretrial Or., 15, ¶ 77; Tr. Transcr., vol. 1, 79-80 (Nargi Direct); Pl.'s Exs. 50-51.)

19.     After receiving the termination notices on September 19, 2001, Mr. Moreas did not call Dollar and offer to pay the amounts owed; instead, he consulted his attorney.  (Tr. Transcr., vol. 5, 646 (Moraes Cross).)

20.     Mr. Moraes sent Dollar a letter on September 19, 2001; the letter was drafted with the help of his financial adviser; in the letter, Mr. Moraes disputed the termination but did not state that he would pay amounts owed to Dollar.  (Tr. Transcr., vol. 5, 646-648 (Moraes Cross).)

21.     Due to termination of the Master Lease Agreements, Dollar commenced repossession of its collateral (i.e., vehicles leased to the Corporate Defendants pursuant to the Master Lease Agreements) on September 19, 2001.  (Agreed Pretrial Or., 15, ¶ 80; Tr. Transcr., vol. 1, 88-89 (Nargi Direct).)

22.     On September 20, 2001, Ms. Davis talked with Tara Doerr, who told her that Mr. Moraes asked her to make out a check to a bankruptcy attorney.  (Tr. Transcr., vol. 1, 143-144 (Davis Direct); Pl.'s Ex. 108.)

23.     On September 20, 2001, Dollar notified the Corporate Defendants in writing that Dollar considered its September 19, 2001, termination notices to be appropriate and valid. Dollar also set forth additional grounds for termination of the License Agreements.  Dollar stated that the Corporate Defendants' failure to pay amounts due within three days would constitute additional grounds for the immediate termination of the License Agreements. (Agreed Pretrial Or., 15, ¶ 78; Tr. Transcr., vol. 1, 88-89 (Nargi Direct); Pl.'s Exs. 53 & 54.) The Defendants did not cure or offer to cure their defaults within, or at any time after, this additional cure period.  (Tr. Transcr., vol. 1, 86-89 (Nargi Direct); Tr. Transcr., vol. 3, 392-393 (Taddei Recross).)

24.     During a phone conversation among Mr. Moraes, Mr. Nargi, and Bill Walker on September 20, Mr. Moraes did not offer to make any payments to Dollar.  (Tr. Transcr., vol. 5, 648-649 (Moraes Cross).)

25.    The Corporate Defendants did not have sufficient funds in their operating accounts in mid-September, 2001, to pay Dollar the amounts due under the License Agreements and Master Lease Agreements.  (Tr. Transcr., vol. 2, 255-256 (Wilsey Direct) (Sept. 14, 2004).)  On September 19, 2001, the Corporate Defendants' operating accounts had a combined balance of less than $300,000.00.  (Tr. Transcr., vol. 2, 304-305 (Wilsey Cross); Tr. Transcr., vol. 4, 439-441 (Moraes Direct); See also Pl.'s Ex. 136.)

26.    In light of the economic conditions of the travel industry after September 11, 2001 and the heavy debt load of the Corporate Defendants, there was no realistic possibility that the Corporate Defendants would have secured a loan or received additional financing in an amount necessary to cure the defaults with Dollar or to continue their business for any length of time.  (Tr. Transcr., vol. 6, 903-906 (Wilsey Rebuttal).)

27.    Subsequent to termination, Dollar drew upon the Corporate Defendants' $422,000 letter of credit required by Dollar to secure the obligations of the Corporate Defendants.  (Agreed Pretrial Or., 15, ¶ 80.)  The Corporate Defendants' failure to pay amounts due under the License Agreements and the Master Lease Agreements permitted Dollar to draw on the letter of credit, thereby reducing the Defendants' overall debt to Dollar by $422,000.  (Tr. Transcr., vol. 1, 108 (Nargi Cross); Tr. Transcr., vol. 2, 195-197 (Manning Direct).)

28.    Dollar did not prevent Corporate Defendants from making their payments during the three-day period by commencing repossession of vehicles because the fleet that Dollar was repossessing was less than 50 percent of the fleet that the Corporate Defendants had on hand.  (Tr. Transcr., vol. 1, 90 (Nargi Direct).)

29.    Dollar terminated the License Agreements and Master Lease Agreements in

accordance with their express terms and conditions.   (Tr. Transcr., vol. 1, 74-76, 80-82 (Nargi Direct).)

30.     Dollar did not terminate the License Agreements and Master Lease Agreements pursuant to a plan to force the Corporate Defendants out of business in order to take over their locations.  (Tr. Transcr., vol. 1, 93 (Nargi Direct); Tr. Transcr., vol. 6, 878 (Nargi Rebuttal).)

31.     None of the Corporate Defendants' rental locations were at the top 50 airports based on reported revenues, according to a report from Auto Rental News covering 2000-2001.  (Tr. Transcr., vol. 1, 72-73 (Nargi Direct); Pl. Ex. 237.)

32.     After termination of the License Agreements and Master Lease Agreements, Dollar's corporate operations group became aware that all of the Corporate Defendants' locations were available and determined to try and operate in two (i.e., Norfolk and Pensacola) of the five cities previously operated by the Corporate Defendants. For both cities, Dollar submitted bids to enter into new concession agreements with the airport authorities, and operations did not commence until 2002.  Additionally, Dollar did not receive any assistance, assets, facilities or contract assignments from the Defendants at any of the locations. (Tr. Transcr., vol. 1, 92-93 (Nargi Direct); Tr. Transcr., vol. 6, 766-767 (Moraes Direct).)

J.     Breach of Contract by Defendants

1.     The parties do not dispute the existence or validity of the Agreements. (Agreed Pretrial Or., 4, ¶¶ (B)(1) & (2); 5, ¶¶ 4 & 7;  6, ¶¶ 11, 13, 17; 7, ¶¶ 21, 23.)   In fact, the only affirmative defense pled by Defendants in response to Dollar's breach of contract claims is improper venue, which defense has been waived.  (Def. Ans. & Counterclaim, 10 (Nov. 6, 2001).)

2.     Defendants have neither paid nor attempted to pay Dollar past due amounts under the Agreements and have failed to cure such defaults.  (Tr. Transcr., vol. 1, 88-89 (Nargi Cross); Tr. Transcr., vol. 3, 392-393 (Taddei Recross); Def. Ans. & Counterclaim, ¶ 27.)

3.     Dollar made it clear to Mr. Moraes that he was not permitted to make late payments in March of 2001 at a meeting among Mr. Moraes, Mr. Nargi, and Wayne Choisnet. Neither was Mr. Moraes told subsequent to that meeting that he could submit late payments to Dollar in June, July, or August of 2001.  (Tr. Transcr., vol. 6, 881-883 (Nargi Rebuttal).)

4.     Mr. Moraes admitted that he was bound by the terms of the Master Lease Agreements and that, under the Master Lease Agreements, Dollar had the right to terminate the agreement and repossess his cars as soon as a payment was missed.  Mr. Moraes also admitted that he failed to pay the August fleet bill on the day it was due -- September 17, 2001.  (Tr. Transcr., vol. 5, 651-652 (Moraes Cross).)

5.     Defendants' failure to pay their August 2001 fleet payments due under the Master Lease Agreements constituted material breach under the Master Lease Agreements and the Guarantee Agreements and constituted an "Event of Default" permitting Dollar to immediately terminate the Master Lease Agreements.  (Tr. Transcr., vol. 1, 74-76 (Nargi Direct); Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 9(A); Pl.'s Ex. 48.)

6.     Defendants' failure to pay amounts due under the License Agreements in June, July, and August of 2001, including multiple other months within the twelve-month period preceding Dollar's termination, constituted material breach under the License Agreements and the Guarantee Agreements and constituted "good cause" permitting Dollar to terminate the License Agreements upon notice.  (Tr. Transcr., vol. 1, 80-84 (Nargi Direct), 131-132 (Davis Direct); Tr. Transcr., vol. 1, 173-174, 178 (Manning Direct); Tr. Transcr., vol. 2, 197

(Manning Direct); Tr. Transcr., vol. 5, 652-654 (Moraes Cross); Pl.'s Exs. 8 & 14 at ¶ 18.3; Pl.'s Exs. 29 & 35 at ¶ 18.2; Pl's Exs. 54 75 & 76.)

7.      In addition, the Corporate Defendants were unable to pay their debts as they became due in September of 2001. (Tr. Transcr., vol. 1, 84 (Nargi Direct), 168-169 (Manning Direct); Tr. Transcr., vol. 5, 625-626 (Moraes Cross); Tr. Transcr., vol. 2, 247, 275-276 (Wilsey Direct).)   The Corporate Defendants' former Chief Financial Officer, Charles Bratcher, testified that the Corporate Defendants were insolvent when he left his position with the Corporate Defendants at the end of August 2001.  (Transcr.  Depo. Bratcher, 125-126.)

8.      Defendants owed many other creditors who were critical to the Corporate Defendants' vehicle rental business, among the largest being fleet providers and airports, over $1,115,000.00 in past due debt as of September 15, 2001.  (Tr. Transcr., vol. 2,  258 (Wilsey Direct); Pl.'s Ex. 143.)

9.      Such insolvency and inability to pay debts constituted material breach and "good cause" permitting Dollar to terminate the Pensacola and Norfolk License Agreements upon notice and causing automatic termination of the Richmond and Alabama License Agreements.  (Tr. Transcr., vol. 1, 84 (Nargi Direct); Pl.'s Exs. 8 & 14 at ¶ 18.3; Pl.'s Exs. 29 & 35 at ¶ 18.2.)

10.     Also, the Corporate Defendants' failure to cure their non-payment of amounts due under the Master Lease Agreements represented defaults under collateral agreements with Dollar.  (Pl.'s Exs. 9, 15, 19, 30 & 36 at ¶ 9(A).)  Such failure constituted material breach under the License Agreements and constituted "good cause" permitting Dollar to terminate the License Agreements upon notice.   (Tr. Transcr., vol. 1, 80-81 (Nargi Direct); Pl.'s Exs. 8, 14, 29 & 35 at ¶ 18.3.)

11.     Mr. Moraes admitted that Dollar had the right to terminate the License Agreements if he defaulted on the Master Lease Agreements.  (Tr. Transcr., vol. 5, 652 (Moraes Cross).)

K.     Amounts Owed by Defendants to Dollar as of June 30, 2003

1.     Dollar continued to deliver Franchise Statements of Account to the Defendants through their attorney of record on a monthly basis in the ordinary course of business.  The most recent Franchise Statements of Account reflect all amounts still due and owing from the Defendants to Dollar to the date of such Statements.  (Agreed Pretrial Or., 13, ¶ 58.)

2.     Mr. Moraes is familiar with the Franchise Statements of Account and reviewed them frequently in his capacity as President of the Corporate Defendants.  (Agreed Pretrial Or., 13, ¶ 61.)

3.     Mr. Moraes is aware that the Corporate Defendants received monthly Franchise Statements of Account and has reviewed these Statements.  (Agreed Pretrial Or., 13, ¶ 62.)

4.     Charles Bratcher, the Chief Financial Officer of the Corporate Defendants from July, 1999 until August 26, 2001, has reviewed many Dollar Franchise Statements of Account over the past seven years.  (Agreed Pretrial Or., 13, ¶ 62; Transcr. Depo Bratcher, 50-51.)

5.     During that time, Mr. Bratcher has never found a Statement to be wrong.  He has discovered only minor discrepancies.  (Agreed Pretrial Or., 13, ¶ 63; Transcr. Depo Bratcher, 50-51.)

6.     Tara Doerr was the Staff Accountant of the Corporate Defendants from May, 2000 through October, 2001.  (Agreed Pretrial Or., 14, ¶ 65; Transcr. Doerr Depo., 9-11 (Nov. 19, 2002).)  Her responsibilities included reconciliation of the Dollar Franchise Statements of Account.  (Agreed Pretrial Or., 14, ¶ 65; Transcr. Doerr Depo., 30-32.)

7.     According to Ms. Doerr, the amounts on the Dollar Franchise Statements of Account were basically correct.  (Agreed Pretrial Or., 14, ¶ 66; Transcr. Doerr Depo., 43-46.)

8.     The only "large" discrepancy (over $1,000) Ms. Doerr recalls is one involving advertising in late 2000.  Ms. Doerr does not recall any such discrepancies in 2001.  (Agreed Pretrial Or., 14, ¶ 67; Transcr. Doerr Depo., 45-46.)

9.     The last set of Statements Ms. Doerr reconciled for the Corporate Defendants were the August 31, 2001 Franchise Statements of Account.  She believes the systems fees amounts on these Statements are correct and does not recall any major discrepancies with these Statements.  (Agreed Pretrial Or., 14, ¶ 68; Transcr. Doerr Depo., 57-60.)

10.     Dollar's current Statements, rather than those issued near the time of termination of the License Agreements and the Master Lease Agreements in September 2001, most accurately identify amounts owed by the Defendants at present, as many charges and credits do not appear immediately on a monthly Statement due to such matters as slow billings by third parties, assessment of certain charges in arrears, and adjustments to lease rates based on interest rate changes.   (Tr. Transcr. vol. 2, 199-201 (Manning Direct); Tr. Transcript, vol. 7, 965-968 (Manning Rebuttal) (Oct. 28, 2004); Pl.'s Ex. 92.5.)

11.     All charges and credits, with the exception of interest on the unpaid amounts which continues to accrue, have now posted to the Corporate Defendants' seven accounts.  (Agreed Pretrial Or., 14, ¶ 69; Tr. Transcr., vol. 2, 199-201 (Manning Direct); Pl.'s Ex. 92.5.)

12.     Dollar has processes whereby licensees can dispute or make inquiries about charges that appear on an invoice or a Franchise Statement of Account.  (Agreed Pretrial Or., 14, ¶ 70; Tr. Transcr., vol. 2, 197-199 (Manning Direct); Pl.'s Ex. 61.)

13.     With respect to fleet-related charges, the licensee must submit an Invoice Dispute Form within thirty (30) days from the date of the disputed invoice.  Fleet-related

disputes are logged by Dollar, in the ordinary course of Dollar's business, on a Vehicle Dispute Log.  (Agreed Pretrial Or., 14, ¶ 71; Tr. Transcr., vol. 2, 197-199 (Manning Direct); Pl.'s Ex. 61.)

14.     With respect to non-fleet-related charges, there are various processes outlined in Dollar's Operations Guide that the licensee must follow. (Agreed Pretrial Or., 14, ¶ 72.)

15.     The Corporate Defendants are aware of the rules concerning dispute or inquiry about charges.  They have utilized these rules previously to dispute charges.  (Agreed Pretrial Or., 14, ¶ 73; Tr. Transcr., vol. 2, 197-199 (Manning Direct); Pl.'s Ex. 61.)

16.     Although the Corporate Defendants continued to receive monthly Franchise Statements of Account from Dollar, they did not notify Dollar, pursuant to any of the processes outlined in the preceding paragraphs, of any dispute with respect to any of the amounts remaining unpaid.  (Agreed Pretrial Or., 13, ¶ 58 and at 14, ¶ 73.)

17.     Dollar has determined to seek damages from Defendants through June 30, 2003.  As a result, Dollar is not seeking to collect interest that has continued to accrue on the PRP/PRT account since June 30, 2003.   (Tr. Transcr., vol. 2, 201 (Manning Direct); Pl.'s Ex. 92.5 & 246.)

18.     As of June 30, 2003, P.R.P. has a credit of $229,152.04 for amounts owed to Dollar under the Pensacola License and Master Lease Agreements with respect to P.R.P.'s Pensacola on-airport franchise location.  This credit includes a $422,000 letter of credit Dollar drew upon and previously applied in favor of Defendants against amounts owed on this account.  (Tr. Transcr., vol. 2, 196-197 (Manning Direct), 230 (Manning Cross); Pl.'s Ex. 246.)

19.     As of June 30, 2003, P.R.P. owes Dollar $15,542.45 under the Pensacola License and Master Lease Agreements with respect to P.R.P.'s Pensacola off-airport franchise location.  (Pl.'s Ex. 246.)

20.     As of June 30, 2003, P.R.P. owes Dollar $306,417.99 under the Birmingham License and Master Lease Agreements.  (Id.)

21.     As of June 30, 2003, P.R.P. owes Dollar $200,562.77 under the Mobile License and Master Lease Agreements.  (Id.)

22.     As of June 30, 2003, P.R.T. owes Dollar $663,210.76 under the Norfolk License and Master Lease Agreements with respect to P.R.T.'s Norfolk franchise location. (Id.)

23.     As of June 30, 2003, P.R.T. owes Dollar $15,379.150 under the Norfolk License and Master Lease Agreements with respect to P.R.T.'s Norfolk off-airport franchise location.  (Id.)

24.     As of June 30, 2003, P.R.T. owes Dollar $373,852.79 under the Richmond License and Master Lease Agreements.  (Id.)

25.     As of June 30, 2003, P.R.P. owes Dollar a total of $293,371.17, plus attorneys' fees, litigation costs, and interest.  (Id., Tr. Transcr., vol. 2, 204 (Manning Direct).)

26.     As of June 30, 2003, P.R.T. owes Dollar a total of $1,052,442.70, plus attorneys' fees, litigation costs, and interest.  (Id.)

27.     As of June 30, 2003, Moraes owes Dollar $1,345,813.87, plus attorneys' fees, litigation costs, and interest, with respect to his guarantee of all amounts owed to Dollar by the Corporate Defendants.  (Tr. Transcr., vol. 2, 203-204 (Manning Direct); Pl.'s Ex. 246.)

28.     As of June 30, 2003, Mr. Taddei owes Dollar $1,052,442.70, plus attorneys' fees, litigation costs, and interest, with respect to his guarantee of all amounts owed to Dollar by P.R.T.  (Tr. Transcr., vol. 2, 204 (Manning Direct); Pl.'s Ex. 246.)

29.     As of June 30, 2003, Mrs. Taddei owes Dollar $373,852.79, plus attorneys' fees, litigation costs, and interest, with respect to her guarantee of all amounts owed to Dollar by P.R.T. in relation to the Richmond franchise location.  (Id.)

L.     Damages

1.     The License Agreements contain provisions prohibiting the Corporate Defendants from recovering consequential damages or lost profits from Dollar.  (Pl.'s Exs. 8, 14, 29 & 35 at ¶ 24.8.)

2.     The waiver of consequential damages provisions in the License Agreements are enforceable with respect to the Corporate Defendants, due to the significant experience and sophistication of Mr. Moraes and Mr. Taddei.  (Tr. Transcr., vol. 1, 59 (Nargi Direct); Tr. Transcr., vol. 4, 528-538, 550 (Moraes Cross); (Agreed Pretrial Or., 9, ¶ 33-34.)

3.     The Corporate Defendants were insolvent in September, 2001 and they were not a going concern.  When Dollar terminated the License Agreements of the Corporate Defendants, Dollar did not cause the Corporate Defendants to suffer damages. (Tr. Transcr., vol. 2, 249 (Wilsey Direct).)

4.     In September, 2001, the Corporate Defendants' failure was imminent with or without the termination of the License Agreements by Dollar.  (Id.)

5.     Given the financial condition of PRP and PRT in September of 2001, the poor historic profit and loss performance of the Corporate Defendants, and the Corporate Defendants' high costs in an industry that is performing poorly in September, 2001, it would

be unreasonable and extremely speculative even to compute future lost profits for the Corporate Defendants.  (Tr. Transcr., vol. 6, 900 (Wilsey Rebuttal); Pl. Ex. 274.)

6.      In the year 2000, the Corporate Defendants had a combined loss of $791,000.  Tr. Transcr., vol. 6, 906 (Wilsey Rebuttal).)

7.      The lost profit calculation offered by Mr. Moraes is speculative, unreliable, and not grounded in fact.  It fails to explain satisfactorily how the Corporate Defendants are able to survive from September, 2001, in their insolvent condition, to 2002 in the face of declining industry revenues after September 11, 2001.  It also contains a mismatch between revenues and costs (fleet and staff), an extremely low discount rate for the ten-year projection, and overstated revenues.  (Tr. Transcr., vol. 6, 901-902, 907-922 (Wilsey Rebuttal).)

8.      Mr. Moraes' lost profits calculation is contrary to actual industry performance in 2002.  (Tr. Transcr., vol. 1, 70-71 (Nargi Direct); Tr. Transcr., vol. 6, 906-907 (Wilsey Rebuttal); Pl.'s Ex. 254 & 274.)

9.      According to generally accepted valuation theory, a business must be a going concern (have a predictable, projectable future income stream to be discounted by a willing buyer) in order to have a value.  (Tr. Transcr., vol. 6, 922 (Wilsey Rebuttal)

10.      There is no evidence that Defendants had a willing buyer for their locations.  (Tr. Transcr., vol. 6, 923 (Wilsey Rebuttal); see generally, Tr. Transcr., vol. 3, 373-395 (Taddei Testimony); Tr. Transcr., vol. 4, 412 - 584 (Moraes Testimony); Tr. Transcr., vol. 5, 590 - 753 (Moraes Testimony); Tr. Transcr., vol. 6, 759-846 (Moraes Testimony).)

11.      Lost profits and fair market value of a company are mutually exclusive damage awards.  (Tr. Transcr., vol. 6, 923 (Wilsey Rebuttal).)

12.      Ana Moraes is not a party to this lawsuit.  (Agreed Pretrial Or., 4, ¶ IV(A).)

13.     Neither Mr. Moraes nor Mr. Taddei have asserted a counterclaim against Dollar in this lawsuit.  (Agreed Pretrial Or., 29, ¶ 46.)

CONCLUSIONS OF LAW

Dollar's Breach of Contract Claims

1.     A breach of contract is a material failure of performance of a duty arising under or imposed by agreement.  See Angier v. Matthews Exploration Corp., 905 P.2d 826, 831 n.2 (Okla. Ct. App. 1995).  To prevail on a claim for breach of contract, the party asserting the claim must establish:

(1) the existence of a contract between the claimant and the adverse party;
(2) an obligation on the adverse party to perform under the contract;
(3) failure by the adverse party to perform the contractual obligation; and
(4) damages suffered by the claimant as a direct result of the breach.

See Bohm, Inc. v. Michael, 46 P.3d 1286, 1288-89 (Okla. Ct. App. 2002) (citing Thompson v. Phillips Pipe Line Co., 438 P.2d 146 (Kan. 1968)); see also Oklahoma Uniform Jury Instruction - Civil No. 23.1.

2.     Determination of materiality generally focuses upon whether or not the nonperformance defeats the object of the parties in forming the contract.  See 14 Richard A. Lord, Williston on Contracts, § 43:6 (4th ed. 2000).  Multiple factors may be considered, but, "if the [breaching] party has also breached other contracts, either with the promisee or with third parties, or has become financially weak or unstable, it is more likely that any breach will be deemed material."  Id.

3.     Contractual "non-waiver" provisions, such as those included in the License Agreements and the Master Lease Agreements, are enforceable under Oklahoma law.  See generally, Gordon v. Continental Ins. Co., 76 P.2d 1055, 1059 (Okla. 1938); Scottish Union & National Ins. Co. v. Cornett Bros., 142 P. 315, 317 (Okla. 1914).

4.      "A guarantor is liable immediately to the guarantee upon the default of the principal without demand or notice." Federal Deposit Ins. Corp. v. Casey, 741 P.2d 463, 465 (Okla. 1987). The Guarantee Agreements are collateral obligations, which are independently and separately enforceable from that of the principal debtors (i.e., the Corporate Defendants.) See Riverside Nat'l Bank v. Manolakis, 613 P.2d 438, 441 (Okla. 1980); Janeway v. Vandeventer, 45 P.2d 79, 82-83 (Okla. 1935).

5.      Even if a franchisee prevails against the franchisor on a claim of wrongful termination of the franchise, the franchisee remains liable for nonpayment of amounts owed to the franchisor prior to termination.  See Boyers v. Texaco Ref. & Mktg., Inc., 848 F.2d 809 (7th Cir. 1988); see also Howard S. Wolfson, "One Royalty Strike and You're Out!":  A Franchisor's Independent Right to Terminate a Franchise Agreement for Nonpayment of Royalties and the Remedies Available Under the Lanham Act," 17 Franchise L. J. 1 (Summer, 1997) ("The franchisor's right to receive royalties pursuant to the franchise agreement is wholly distinct from any claim the franchisee may have against the franchisor and comparing the two is like comparing apples and oranges.").

6.      The elements required for Dollar's breach of contract claims have been met, in that the Agreements were existing and valid, the Defendants were obligated under such Agreements to remit payments to Dollar, the Defendants failed to remit such payments and, as a result, Dollar incurred significant damages in the amount of such non-payments, plus interest.  Dollar did not waive the Defendants' obligations to timely pay amounts due under the Agreements, and, regardless of whether or not the Defendants can prevail on their claims of wrongful termination, the Defendants remain liable for amounts owed under the Agreements which do not arise from termination.  See supra at ¶¶ 4-23, 56-75, 89, 92, 116, 145-146, 155-183 & 197-201.

7. The party terminating a contract need not explain the reason(s) for termination at the time of termination, as long as a legally adequate reason exists. See College Point Boat Corp. v. U.S., 267 U.S. 12, 15-16 (1925); Hoffman v. General Motors Acceptance Corp., 814 F.2d 1385, 1388 (9th Cir. 1987); First Commodity Traders v. Heinold Commodities, 766 F.2d 1007, 1013 (7th Cir. 1985). Dollar was not required to specify its grounds for termination in its September 2001 termination letters and, therefore, is not precluded from subsequently raising reasons for termination that were not expressed in such letters but were existing at the time of termination. See Pl. Exs. 50-51.

B.    Defendants' Breach of Contract Claims and Dollar's Defenses

1. Under well established common law rules, a party in material breach of a contract cannot enforce or recover on the contract. See Owens v. Automotive Engineers, Inc., 255 P.2d 240, 247 (Okla. 1953); Camp v. Black Gold Petroleum Co., 154 P.2d 769, 771 (Okla. 1944); Messick v. Johnson, 30 P.2d 176, 178 (Okla. 1934); Robberson Steel Co. v. Harrell, 177 F.2d 12, 17 (10th Cir. 1949); 17B C.J.S. Contracts § 503 (1999); Restatement (Second) of Contracts § 237 (1981.)

2. Additionally, repudiation of a contract by a party excuses the other party to the contract from performing. See Hidalgo Properties, Inc. v. Wachovia Mortg. Co., 617 F.2d 196, 199 (10th Cir. 1980); Bu-Vi-Bar Petroleum Corp. v. Krow, 40 F.2d 488, 491 (10th Cir. 1930.) The Oklahoma Supreme Court has described the doctrine of anticipatory repudiation as follows:

> It is a well-established rule that the declaration on the part of one party to a bilateral, executory contract, of his intention not to perform it, thus making the other party's tender of performance futile, relieves the latter of the necessity of making the idle gesture of a formal tender.

Bushey v. Dale, 75 P.2d 193, 196 (Okla. 1937.) See also EKE Builders, Inc. v. Quail Bluff

Assoc., 714 P.2d 604, 608 (Okla. Ct. App. 1985) ("The [Defendant]'s declarations and actions amounted to a repudiation of the contract justifying plaintiff to treat the contract as totally breached and to immediately sue for damages."); Bu-Vi-Bar, 40 F.2d at 491-93 (holding that plaintiffs were excused from performing under contract when defendant failed to retract repudiation prior to plaintiffs' election to treat repudiation as breach and change of position to their detriment.)

3.      Under Oklahoma law, "where the original contract does not contemplate the making of a subsequent agreement, the original consideration will not support the subsequent agreement; and therefore a subsequent agreement not forming a part of the original contract, or supported by the original consideration thereof or by any new consideration, is without binding effect." Robberson Steel,  177 F.2d at 15 (applying Oklahoma law); accord State v. City of Sapulpa, 160 P. 489, 491 (Okla. 1916.)

4.      The elements of estoppel under Oklahoma law are (1) a false representation or concealment of facts, (2) made with actual or constructive knowledge of the fact, (3) to a party without knowledge of, or the means of knowing, those facts, (4) with the intent that it be acted upon, and (5) the party to whom it was made acted in justified reliance upon it to its detriment. See Indiana Natl. Bank v. State Dept. of Human Services, 857 P.2d 53, 64 (Okla. 1993.)

5.      In Oklahoma, waiver consists of (1) the knowledge of existence of a right and (2) an intention to relinquish such right.  See Barringer v. Baptist Healthcare of Okla., 22 P.3d 695, 700-01 (Okla. 2001); Robberson Steel, 177 F.2d at 15.   Waiver can be express or implied.  See Barringer, 22 P.3d at 701. Implied waiver may be established by action or conduct warranting an inference of intent to relinquish.  See, Id.

6.      The elements required for the Defendants' breach of contract claims have not been met.   The Agreements did not obligate Dollar to allow the Defendants any opportunity to cure their defaults under the circumstances.  Given that the Defendants materially breached the Agreements by failing to pay significant amounts when due, the Defendants cannot seek to

enforce and recover on the Agreements and argue that Dollar subsequently breached the Agreements.  See supra at ¶¶ 112-143, 197-208.

7.     Alternatively, the Defendants repudiated the Agreements through Moraes' statements to Dollar that the Corporate Defendants were unable to pay amounts due under the Master Lease Agreements, thereby excusing Dollar from performing under the Agreements, because "[t]he law does not require a vain and idle ceremony."  Bu-Vi-Bar, 40 F.2d at 491.

8.     Dollar's offer of a three-day cure period in its September 18, 2001, letter lacked consideration and was non-binding, because Dollar merely offered to allow the Defendants additional time to do what they were already obligated to do (i.e., remit payments under the Agreements); due to Mr. Moraes' representations on September 19, 2001, that the Corporate Defendants were unable to pay amounts due to Dollar, the Defendants are estopped from now asserting that they actually could have remitted such payments; and, likewise, by virtue of Mr. Moraes' representation of inability to pay, the Defendants waived any right to cure their defaults under the Master Lease Agreements.  See supra at ¶¶ 76-85, 112-154, 204-210.

C.      Breach of Implied Covenant of Good Faith and Fair Dealing

1.      The common law of Oklahoma implies in all contracts a mutual covenant that the parties will act towards each other in good faith.  See Beshara v. Southern Natl. Bank, 928 P.2d 280, 288 (Okla. 1996); First Natl. Bank & Trust Co. of Vinita v. Kissee, 859 P.2d 502, 509 (Okla. 1993); Rodgers v. Tecumseh Bank, 756 P.2d 1223, 1227 (Okla. 1988); Hall v. Farmers Ins. Exchange, 713 P.2d 1027, 1029 (Okla. 1985).   However, "[a]s a general principle, there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract." 23 Samuel Williston, A Treatise on the Law of Contracts, §63:22, 516 (4th ed. 2002); see also Big Yank Corp. v. Liberty Mut. Fire Ins. Co., 125 F.3d 308, 313 (6th Cir. 1997); Burger King Corp. v. Weaver, 169 F.3d 1310, 1318 (11th Cir. 1999).

2.      Additionally, "without 'gross recklessness or wanton negligence on behalf of a party' to a commercial contract, a breach of the implied covenant of good faith and fair dealing merely results in a breach of contract."  Kissee, 859 P.2d at 509 (quoting Rodgers, 756 P.2d at 1227).

3.      Dollar did not breach the implied covenant of good faith and fair dealing, as Dollar terminated the License Agreements and Master Lease Agreements in accordance with the provisions of such Agreements.   See supra at ¶¶ 139-140, 209-210.

D.      Fraudulent Misrepresentation

1.      Under Oklahoma law, the elements for fraudulent misrepresentation are:

(1)  The defendant made a material representation that was false;
(2)  The defendant knew when he made the representation that it was false or he made it recklessly, without any knowledge of its truth and as a positive assertion;

    (3)  The defendant made the misrepresentation with the intention that it should
        be acted upon by the plaintiff;
    (4)  The plaintiff acted in reliance upon the misrepresentation; and
    (5)  The plaintiff thereby suffered injury.

See Gay v. Akin, 766 P.2d 985, 989 (Okla. 1988); Silk v. Phillips Petroleum Co., 760 P.2d 174, 176-77 (Okla. 1988).  The Defendants, as the parties asserting the claim of fraud in this case, have the burden of proving each of these elements by clear and convincing evidence in this case.  See Silk, 760 P.2d at 177.

    2.     The elements for fraudulent misrepresentation have not been proven by the Defendants.  There is no evidence that Dollar's allowance of a three-day cure period was false at the time it was made or that Dollar knew the allowance was false when made.  See supra at ¶¶ 122, 215.

E.     Tortious Interference with Contract and Business Expectations

    1.     Oklahoma law recognizes claims for both tortious interference with contractual relations and tortious interference with prospective economic advantage.  See Overbeck v. Quaker Life Ins. Co., 757 P.2d 846, 847-48 (Okla. Ct. App. 1984) (citing Oklahoma Supreme Court cases recognizing tortious interference with a business or contractual relationship); McNickle v. Phillips Petroleum Co., 23 P.3d 949, 953 (Okla. Ct. App. 2001) (citing Overbeck as recognizing tortious interference with prospective economic advantage).

    2.     The party asserting a claim of tortious interference bears the burden of proving the following elements:

    (1)  The claimant had a business or contractual right with which there was
        interference;
    (2)  The interference was malicious and wrongful;
    (3)  The interference was neither justified, privileged nor excusable; and
    (4)  Damage was sustained as a proximate result of the interference.

See Morrow Dev. Corp. v. American Bank & Trust Co., 875 P.2d 411, 416 (Okla. 1994).

    3.     Both of these interference torts require an "intentional" interference.  The "interference is intentional if the interferer acted with the purpose to interfere with the

relationship or expectancy." Boyle Services, Inc. v. Dewberry Design Group, Inc., 24 P.3d 878, 880 (Okla. Ct. App. 2001) (emphasis added).

4.      Privilege is a complete defense to a claim of tortious interference. See Morrow, 875 P.2d at, 417.  Interference is privileged if the interfering party's primary focus was protection of legitimate economic interests, rather than interference. See Green Bay Packaging, Inc. v. Preferred Packaging, Inc., 932 P.2d 1091, 1096 (Okla. 1996); Morrow, 875 P.2d at 416.

5.      The elements for tortious interference with contract and with business expectations have not been proven by the Defendants.  Dollar terminated the License Agreements and Master Lease Agreements in accordance with its express rights under such Agreements.  Dollar did not terminate the License Agreements and Master Lease Agreements pursuant to a plan to force the Corporate Defendants out of business to take over their locations.  See supra at ¶¶ 140-141, 217-220.

6.      If there were interference, then that interference by Dollar was privileged because it was done by fair means, with honest intent, and for the purpose of furthering Dollar's own legitimate economic interest rather than principally to harm the Corporate Defendants.  See supra at ¶¶ 220-221.

F.      Unjust Enrichment

1.      In conformance with principles expressed under Oklahoma law, the elements for unjust enrichment have been enumerated as:

    (1)  an enrichment to the adverse party;
    (2)  an impoverishment to the claimant;
    (3)  a connection between the enrichment and impoverishment;
    (4)  an absence of justification; and
    (5)  an absence of remedies at law.

See 66 Am. Jur. 2d Restitution and Implied Contracts § 12 (2001.)

2.      Unjust enrichment is an equitable doctrine and is recognized in Oklahoma as a basis for recovery when a party fails to make restitution under circumstances equitably requiring restitution.  See N.C. Corff Partnership, LTD v. OXY USA, Inc., 929 P.2d 288, 295 (Okla. Ct. App. 1996.)  The party asserting a claim for unjust enrichment must show that the adverse party received money or other benefit, at the expense of the claimant, that in equity and good conscience should not be retained by the adverse party.  See French Energy, Inc. v. Alexander, 818 P.2d 1234, 1237 (Okla. 1991); Lapkin v. Garland Bloodworth, Inc., 23 P.3d 958, 961 (Okla. Ct. App. 2001); N.C. Corff, 929 P.2d at 295.

3.      A party must come before the court with "clean hands" to obtain equitable relief.  See State, ex rel. Dept. of Human Services, ex rel. Jones v. Baggett, 990 P.2d 235, 244 (Okla. 1999); Story v. Hefner, 540 P.2d 562, 567 (Okla. 1975.)  Under the "clean hands" doctrine, a party cannot invoke the equitable powers of the court when guilty of unlawful or inequitable conduct in relation to the matter for which relief is sought.  See Baggett, 990 P.2d at 244; Leathers v. Commercial Natl. Bank in Muskogee, 410 P.2d 541, 546 (Okla. 1965) (quoting Camp v. Camp, 163 P.2d 970, 972 (Okla. 1945).)

4.      The Defendants have not proven that Dollar was unjustly enriched.  Dollar was justified in terminating the License Agreements and Master Lease Agreements, and no evidence exists that Dollar was unjustifiably enriched, at the Defendants' expense, through its termination of the License Agreements and Master Lease Agreements.  Further, the Defendants come before this Court with "unclean hands," having breached the Agreements first by failing to timely pay amounts due, and, therefore, cannot obtain equitable relief. Finally, the Corporate Defendants have an adequate legal remedy.  See supra at ¶¶ 112-143, 155-183, 223-225.

G.      Damages

1.      The Corporate Defendants are contractually precluded from recovering lost profits or consequential damages from Dollar.  Fretwell v. Protection Alarm Co., 764 P.2d 149, 151 (Okla. 1988); Phillips Machinery Co. v. LeBlond, Inc., 494 F. Supp. 318 (N.D. Okla. 1980); Elsken v. Network Multi-Family Sec. Corp., 838 P.2d 1007 (Okla. 1992); Vails v. Southwestern Bell Tel. Co., 504 F. Supp. 740 (W.D. Okla. 1980); Tulsa Trailer & Body, Inc. v. Trailmobile, Inc., 1986 U.S. Dist. LEXIS 26395 at *14 (N.D. Okla. 1986).

2.      The Corporate Defendants are precluded from seeking recovery for damages not disclosed during discovery such as "lost value of the businesses" and "amounts owed to other creditors."  Minute Order, dated Oct. 7, 2003 (granting Dollar's motions in limine); Fed. R. Civ. P. 26; Digital Design Group, Inc. v. Information Builders, Inc., 24 P.3d 834, 844 & n.28 (Okla. 2001).

3.      The Defendants have failed to meet their burden to prove that the limitation of damages clauses in the License Agreements are unconscionable.  "[I]n a commercial setting, the burden of proving unconscionability is on the party seeking to invalidate the contract or clause."  Phillips Machinery Co. v. LeBlond, 494 F. Supp. 318, 323 (N.D. Okla. 1980) (applying Oklahoma law.)  Where "the loss is commercial" there is "no prima facie unconscionability."  See id.  In determining unconscionability, "[t]here is no requirement that there be equality of bargaining power," and a clause will not be invalidated simply because it "allocate[s] risks to the party having less bargaining power. There must be, in addition, some element of deception or substantive unfairness."  Id. (discussing more restrictive requirements of Uniform Commercial Code.)  "In addition, … the party challenging the clause must show that there is no reasonable relation to the risks involved and that the terms are so one-sided as

to be oppressive." Id. at 323-24.   The evidence does not support their argument of unconscionability.  See supra at ¶¶ 24-48.

4.     The Corporate Defendants may not recover both lost profits and lost value of the businesses.  See Protectors Ins. Serv., Inc. v. U.S. Fidelity & Guar. Co., 132 F.3d 612, 617 (10th Cir. 1998).

5.     The Corporate Defendants may not recover from Dollar amounts owed and unpaid to other creditors.  See Okla. Stat. tit. 23, § 21 (2001) (measure of damages for breach of contract is detriment proximately caused by breach).

6.     Mr. and Mrs. Moraes and Mr. Taddei cannot recover damages from Dollar, as they have asserted no claim against Dollar in this lawsuit.  See supra at ¶¶ 195-196.

H.     Costs

1.     As the prevailing party, Dollar will additionally be entitled to recover its litigation costs and expenses, including attorneys' fees, in accordance with the terms and conditions of the Agreements.  See Finnell v. Seismic, 67 P.3d 339, 343 (Okla. 2003) (noting Oklahoma follows the American Rule, under which litigation expenses are recoverable by a prevailing party when authorized by contract or statute); Morgan v. Galilean Health Enter., Inc., 977 P.2d 357, 362 (Okla. 1998) (same); see also Okla. Stat. tit. 12, § 936.

IT IS SO ORDERED this 8th day of May 2006.

James H. Payne
United States District Judge
Northern District of Oklahoma